**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

HARTFORD HOSPITAL,
80 Seymour Street
Hartford, CT 06102,

*Plaintiff*,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
200 Independence Avenue SW
Washington, DC 20201,

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services,
200 Independence Avenue SW
Washington, DC 20201,

HEALTH RESOURCES & SERVICES
ADMINISTRATION,
5600 Fishers Lane
Rockville, MD 20857,

*and*

CAROLE JOHNSON, in her official capacity as
Administrator of the Health Resources & Services
Administration,
5600 Fishers Lane
Rockville, MD 20857,

*Defendants*.

**MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR TEMPORARY RESTRAINING ORDER**
**OR, ALTERNATIVELY, PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff Hartford Hospital worked tirelessly to care for Connecticut residents during the

COVID-19 public health emergency.  It incurred patient care expenses to test, treat, and vaccinate

patients against COVID-19.  And it lost revenues when it suspended the delivery of existing

1

services at the urging of public health officials.  It did all of those things in good faith, with the expectation that the revenues it lost and the patient care expenses it incurred would be partly offset with the Provider Relief Fund (PRF) dollars that Congress appropriated for hospitals.  Hartford Hospital was understandably surprised when the Health Resources and Services Administration (HRSA) of the U.S. Department of Health and Human Services (HHS)—which administers the PRF—denied a total of $42,934,851.37 in PRF dollars based on a scrivener's error that Hartford Hospital made when reporting its revenues in a field in its PRF Phase 3 application.  Hartford Hospital pointed HRSA to the uncontroverted correct revenue figure elsewhere in that application. But even then, HRSA persisted in repeatedly and inexplicably construing the inconsistency in the application against Hartford Hospital and denying the $42,934,851.37 in PRF dollars.

The deprivation of the PRF dollars is irreparably harming Hartford Hospital by diminishing its ability to pursue its mission, which includes promoting the general health of Connecticut residents.  What is more, Hartford Hospital now faces the threat of permanently losing access to PRF dollars on June 1, 2023, when legislation rescinding appropriations of unobligated PRF dollars is likely to become law.  The permanent loss of access to PRF dollars would compound the irreparable harm to Hartford Hospital.

Hartford Hospital files this motion for a temporary restraining order (TRO) or, in the alternative, a preliminary injunction to stop the irreparable harm before June 1, 2023.  Hartford Hospital is clearly entitled to emergency relief because the actions by HRSA are clearly arbitrary and capricious.  HRSA has never articulated a rational connection between the scrivener's error in the Phase 3 application and the repeated denials of funding.  HRSA knew about the scrivener's error, knew that the correct revenue information was elsewhere in the Phase 3 application, and failed completely to offer a satisfactory explanation for harshly construing the inconsistency

against Hartford Hospital at every turn.  There is ultimately no satisfactory explanation because denying PRF dollars based on a scrivener's error is not reasonable.  Nor is there any public interest in allowing such clearly arbitrary and capricious actions to continue unrestrained.

The Court should restrain the Defendants from enforcing their PRF Phase 3 and 4 determinations against HRSA.  Then it should order the Defendants to immediately obligate the full $42,934,851.37 in PRF dollars sought by Hartford Hospital subject to the Defendants reprocessing Hartford Hospital's Phase 3 and 4 applications.  The order should require the defendants to complete the reprocessing, determine the final PRF dollars payable to Hartford Hospital, and actually pay those dollars to Hartford Hospital by May 31, 2023.  The immediate obligation of PRF dollars will stop a rescission from compounding the ongoing irreparable harm to Hartford Hospital.  Payment by May 31 will stop the irreparable harm altogether.

The Court should grant the emergency relief sought by Harford Hospital for these and other reasons set forth in greater detail below.

## THE PROVIDER RELIEF FUND

Congress recognized the impact of the COVID-19 pandemic on hospitals such as Hartford Hospital and appropriated funds to provide them with relief. On March 27, 2020, Congress passed the Coronavirus, Aid, Relief and Economic Security Act (CARES Act) and appropriated $100 billion to the Public Health and Social Services Emergency Fund (PHSSEF) for health care providers "for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116-136, 134 Stat. 281 (2020). With these funds and additional appropriations under the Paycheck Protection Program and Health Care Enhancement Act (PPPHCEA), Pub. L. No. 116-139, 134 Stat. 620 (2020) and the Consolidated Appropriations Act, 2021 (CAA), Pub. L. No. 116-260, 134 Stat. 1182, HHS created the PRF.

Congress tasked HHS with "reimburs[ing] through grants or other mechanisms, eligible

3

health care providers for health care related expenses or lost revenues that are attributable to coronavirus." CARES Act 134 Stat. at 563; PPPHCEA, 134 Stat. at 622; CAA, 134 Stat. at 1920. Congress directed the Secretary to review applications on a rolling basis and make payments "in consideration of the most efficient payment systems practicable to provide emergency payment." CARES Act 134 Stat. at 563; PPPHCEA, 134 Stat. at 623; CAA, 134 Stat. at 1920. "[E]ligible health care providers" are "public entities, Medicare or Medicaid enrolled suppliers and providers, and such for-profit entities and not-for-profit entities . . . that provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19." CARES Act 134 Stat. at 563; PPPHCEA, 134 Stat. at 623; CAA, 134 Stat. at 1920.

HHS delegated administration of the PRF to HRSA. There is no regulatory regime governing the administration of the PRF. Rather, HRSA administers the PRF through a vast array of guidance that divides the distribution of PRF dollars into four phases of General Distributions and other Targeted Distributions applying complex methodologies to calculate distributions to eligible hospitals in each phase. The guidance changes frequently, without notice.

This case centers on General Distribution Phases 3 and 4. In Phase 3, HRSA instructed hospitals to seek PRF dollars by submitting a Phase 3 application form. The Phase 3 application form directed applicants to state their revenues in Field 10, and enclose a copy of their most recent federal income tax return confirming those revenues. Complaint, ¶ 30; HRSA, Frequently Asked Questions: Phase 3 Application Process, HRSA Provider Relief, 68, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/provider-relief-fund-faq-complete.pdf (last updated May 5, 2023).

HRSA processed Phase 3 applications by "determining the greater of 88 percent of losses . . . for the first and second quarters of 2020 or 2 percent of the net patient revenue from a

provider's application submission, minus prior [PRF] payments made to that provider and its listed subsidiaries . . ." HRSA, Provider Relief Fund Phase 3: Payment Calculation Methodology, p. 1, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/phase-3-methodology-overview.pdf. Phase 3 payment determinations were based on a review of the "provider's application submission." *Id*. HRSA flagged "high-dollar applications", which triggered a manual review of supporting documentation. *Id*. at pp. 4-5.

For the majority of Phase 3 payments, HRSA calculated 88% of losses for the first and second quarters of 2020 by multiplying the initial loss ratio for the applicant against the annual patient care revenue for the applicant, and then multiplying the resulting adjusted lost revenues and expenses by 88%. *Id*. at pp.1, 3. In the less than 10% of applications in which single quarter revenue or expenses exceeded 50% of total annual revenue for the applicant, HRSA used a mean loss ratio for the applicant's provider type instead of the applicant's actual loss ratio. *Id*. at p. 3. That is, HRSA multiplied a mean loss ratio against the applicant's annual patient care revenue to determine the adjusted lost revenues and expenses, which HRSA then multiplied by 88%. *Id*.

In Phase 4, the payment methodology has two components: a base payment and a bonus payment. Relevant here, the base payment is allocated to providers based on their change in revenue and expenses from July 1, 2020 to March 31, 2021 HRSA, <u>Phase 4 General Distribution and ARP Rural Payments: Payment Methodology</u>, HRSA Provider Relief, <u>https://www.hrsa.gov/provider-relief/future-payments/phase-4-arp-rural/payment-methodology</u> (last updated June 2022). Large providers (with annual net patient care revenues greater than or equal to $100 million) were eligible to receive 20% of their changes in revenues and expenses from the measurement period. *Id*. "HRSA then deducted from the Phase 4 Base Payment any prior Provider Relief Fund payments, which were not previously deducted from the Phase 3

General Distribution payment.  The Phase 4 deductions included any prior Provider Relief Fund payments that exceeded 2% of annual patient care revenue or 88% of changes in operating revenues and expenses for the first half of the calendar year." *Id*.

HRSA established voluntary processes through which a provider that believed that its Phase 3 or Phase 4 determination was calculated incorrectly could request reconsideration. HRSA limited the scope of its reconsideration to the review of its calculations based on the provider's Phase 3 or Phase 4 application and corresponding reconsideration request.  HRSA, Frequently Asked Questions: Phase 3 Application Process, HRSA Provider Relief, 67, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/provider-relief-fund-faq-complete.pdf (last updated May 5, 2023); HRSA, PRF Reconsiderations Request Frequently Asked Questions, https://www.hrsa.gov/provider-relief/payment-reconsideration/faq (last updated May 2023).

## FACTUAL BACKGROUND

Hartford Hospital is a not-for-profit hospital.  Its charitable mission includes providing health and wellness services, providing educational services in furtherance of health and wellness, promoting the general health of Connecticut residents and the communities it serves, and otherwise charitably benefitting patient care and improving the health and healing of the people it serves.  Complaint, Exhibit 1, ¶ 28.

Hartford Hospital is part of Hartford HealthCare. Complaint ¶ 21.  During the COVID-19 pandemic, Hartford HealthCare cared for approximately 17,000 patients with COVID-19, conducted approximately 1.6 million COVID-19 tests, and delivered approximately 700,000 vaccinations. *Id*. ¶ 22.  While serving as a lynchpin of the health safety net for the citizens of Connecticut during the pandemic, Hartford HealthCare continued to provide vital ambulatory and outpatient services.  It also conducted approximately 180,000 virtual patient visits.  *Id*.

*The Phase 3 reconsideration determination*

Hartford Hospital timely applied for a Phase 3 General Distribution payment on November 5, 2020. *Id*. ¶ 35.  Hartford Hospital met all statutory eligibility criteria for a General Distribution Phase 3 payment of PRF dollars. *Id*. ¶ 36.

The cover pages of the Phase 3 application form contained fields for Hartford Hospital to complete. *Id*. ¶ 37.  Field 10 asked for "Revenues" from the applicant's most recently filed federal income tax return.  *Id*.  The Hartford Hospital staff inadvertently omitted the last digit of its 2018 tax year Revenues when the staff filled out Field 10. *Id*. ¶ 38.  Hartford Hospital reported in Field 10 that its Revenues were $173,274,568, instead of $1,732,745,685. *Id*.

The scrivener's error in Field 10 was clear on the face of the application.  As the instructions required, the Phase 3 application included the Form 990 (that is, the tax return) that Hartford Hospital filed with the IRS for the tax year beginning October 1, 2018 and ending September 30, 2019. *Id*. ¶ 40.  Line 9 of Part 1 of Hartford Hospital's Form 990 stated that the program service revenue for 2018 was $1,732,745,685. *Id*.  So did line 2g of Part VIII.  *Id*.

HRSA should have flagged the Phase 3 application for a manual review of supporting documentation because it was a high-dollar application.  *Id*. ¶¶ 43-45.  HRSA did not do so. *Id*.  Instead, HRSA determined that Hartford Hospital was ineligible for Phase 3 funding. *Id*. ¶ 45.

Hartford Hospital timely submitted a Phase 3 reconsideration request to HRSA on October 26, 2021.  The request identified the scrivener's error in the Phase 3 application.  It also pointed HRSA to the uncontroverted correct revenue figure in the tax return. *Id*. ¶ 48. On April 27, 2022, HRSA notified Hartford Hospital that the reconsideration was complete and that it would not revise its Phase 3 payment determination. *Id*. ¶ 49. HRSA stated that Hartford Hospital had received prior PRF payments that were equal to or greater than the calculated Phase 3

payment, or that the payment was below the $100 minimum payment threshold. *Id*.

HRSA later told Hartford Hospital that based on the scrivener's error, HRSA found that single quarter revenue or expenses exceeded 50% of total annual revenue for Hartford Hospital by using $173,274,568 as the total annual revenue amount (instead of $1,732,745,685). Based on that finding, HRSA used a mean loss ratio instead of the initial loss ratio for Hartford Hospital in the payment equation. The use of the scrivener's error and mean loss ratio led HRSA to incorrectly conclude that Hartford Hospital's prior PRF payments exceeded its Phase 3 payment eligibility (resulting in a $0.00 payment), and that HRSA had effectively overpaid Hartford Hospital by over $90,000,000 in earlier PRF phases (HRSA refers to these as "overages," or "Portal 3 overages"). *Id*. ¶¶ 39, 62.

*The Phase 4 payment determination*

Hartford Hospital timely applied for Phase 4 funding on October 25, 2021. *Id*. ¶ 50. It met all statutory eligibility criteria to receive a Phase 4 payment. *Id*. ¶ 51.

On May 18, 2022, Hartford Hospital received an email notification from HRSA that it would receive a Phase 4 Payment. The email was HRSA's Phase 4 payment determination for Hartford Hospital. It did not state the type or amount of the payment. *Id*. ¶ 52.

Hartford Hospital received a payment of $3,876,889.08 for Phase 4, and had expected a payment of more than $23 million. Hartford Hospital contacted HRSA, conveyed that it had expected a much larger payment, and requested the methodology for the Phase 4 payment determination. *Id*. ¶ 53.

On June 7, 2022, HRSA replied by email. It stated that it applied its mean acute care hospital quarterly loss ratio (4.02%) to Hartford Hospital's annual net patient care revenue, which resulted in artificially lower "imputed" losses of $71,604,209.50, as compared to Hartford

Hospital's actual losses of $119,109,776.00.  HRSA did not explain why it applied the mean loss ratio.  Next, HRSA stated that it applied 20% (reflecting the "large" provider percentage of change in revenues and expenses to be paid under the Phase 4 payment methodology) to the "imputed" losses, resulting in a potential Phase 4 base payment of $14,320,841.90.  Finally, HRSA stated that it deducted so-called "Portal 3 overages" ($90,529,174.73) from the potential Phase 4 base payment, resulting in a final Phase 4 base payment of $0.  The payment of $3,876,889.08 for Phase 4 was a bonus payment, not a base payment.  *Id.* ¶ 54.

Hartford Hospital timely submitted a Phase 4 reconsideration request to HRSA on July 1, 2022.  Hartford Hospital explained that HRSA's calculation was incorrect because it used "imputed" losses of $71,604,209.50 instead of actual losses of $119,109,776.00.  The use of actual losses would have yielded a potential base payment of more than $23 million.  Hartford Hospital further explained that HRSA incorrectly determined that Hartford Hospital had "Portal 3 overages" due to the scrivener's error in the Phase 3 application.  HRSA should not have deducted any "Portal 3 overages" from the potential base payment to zero it out because the overages existed only on the basis of calculations using the scrivener's error.  *Id.* ¶ 56.

HRSA later informed Hartford Hospital that it applied the mean acute care hospital quarterly loss ratio because Hartford Hospital's corporate affiliate Connecticut Imaging Partners (CIP) had applied for Phase 4 funds in error.  But CIP withdrew its Phase 4 application months before the Phase 4 payment determination for Hartford Hospital.  So HRSA should not have applied the mean acute care hospital quarterly loss ratio.  *Id*. ¶¶ 64, 66.

HRSA also informed Hartford Hospital that it deducted from the Phase 4 payment the "overages" from HRSA's calculation of the Phase 3 payment based on the scrivener's error. There were, of course, no such overages when calculating the Phase 3 payment using the

uncontroverted correct revenue figure. *Id.* ¶¶ 64, 67.  The calculation of such overages and application to the Phase 4 payment was incorrect.

The Phase 4 reconsideration request remains pending with HRSA.

## ARGUMENT

### I.    Standard of Review

The Court may issue a temporary restraining order without notice to the adverse party if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

"In the Second Circuit, the standard for issuance of a temporary restraining order ("TRO") is the same as the standard for a preliminary injunction." *Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013). The movant must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, (2) a likelihood of success on the merits, and (3) that the balance of hardships tips decidedly in favor of the moving party. *Mullins v. City of N.Y.*, 626 F.3d 47, 53 (2d Cir. 2010).  The standard "requires a *threat* of irreparable harm, not that irreparable harm already have occurred."  *Mullins*, 626 F.3d at 55 (finding irreparable harm based on government conduct that presented risk of deterring plaintiffs' participation in litigation).  "Non-profit organizations are deemed to suffer irreparable harm when governmental action forces them to divert resources away from their organizational missions."  *Islam v. Cuomo*, 475 F.Supp.3d 144, 153-54 (E.D.N.Y. 2020) (finding irreparable harm were government failure to pay benefits to organization's members caused organization to divert its resources); *see also Make the Rd. New York v. Cuccinelli*, 419 F.Supp.2d 647 (S.D.N.Y. 2019); *Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 1112, 134-35 (N.D.N.Y. 2016).

Where "(i) an injunction will alter, rather than maintain the, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995); *see also Hardaway v. Nigrelli*, 22-CV-771, 2022 WL 11669872 (W.D.N.Y. Oct. 20, 2022) (TRO context).

## II.   Hartford Hospital will suffer irreparable harm absent emergency relief

Hartford is a not-for-profit hospital.  Its charitable mission includes providing health and wellness services, providing educational services in furtherance of health and wellness, promoting the general health of Connecticut residents, and otherwise charitably benefitting patient care and improving the health and healing of the people it serves. Complaint, Exhibit 1, ¶ 28.

The Phase 3 reconsideration and Phase 4 payment determinations deprived Hartford Hospital of PRF dollars that would have offset patient care expenses incurred and revenues lost because of COVID-19.  The deprivation of the PRF dollars caused Hartford Hospital to use existing cash on hand to cover the patient care expenses incurred and the revenues lost because of COVID-19.  But-for the deprivation of the PRF dollars, Hartford Hospital would have used the existing cash on hand for operations, community benefit services and activities, or facilities and equipment, all of which enable Hartford Hospital to advance its charitable mission.   The deprivation of PRF dollars is diminishing Hartford Hospital's ability to advance its charitable mission, *id*.; and irreparably harming Hartford Hospital.  *Islam*, 475 F.Supp.3d at 153-54; *Make the Rd. New York*, 419 F.Supp.2d at 665; *Step By Step, Inc.*, 176 F. Supp. 3d at 134-35.

What is more, Congress is imminently set to rescind, as part of legislation to raise the debt limit, appropriations of unobligated PRF dollars.  On April 26, 2023, the House of Representatives

passed a bill that would rescind all unobligated pandemic relief funds appropriated through the CARES Act, PPPHCEA and the CAA, and the bill is before the Senate. *See* Congress.gov, H.R. 2811 – Limit, Save, Grow Act of 2023. *See* https://www.congress.gov/bill/118th-congress/house-bill/2811/actions. The CARES Act, PPPHCEA and the CAA funded the PRF, and Hartford Hospital's request for those PRF dollars is the subject of this case.

It is likely that, on or before June 1, 2023, Congress will pass, and the President will sign, a bill to raise or suspend the debt limit, which is likely to include rescission of appropriated, unobligated PRF dollars. Treasury Secretary Janet Yellen advised Congress that June 1 is the estimated earliest date by which the Department of the Treasury will not be able to satisfy the government's obligations. Letter from Sec. J. Yellen to Hon. K. McCarthy of May 1, 2023. *See* https://home.treasury.gov/news/press-releases/jy1454.   Congress rescinded unobligated funding for other pandemic relief programs. Keep Kids Fed Act of 2022, Pub. L. No. 117-158, 136 Stat. 1309, 1311 (2022); Consolidated Appropriations Act § 101(d)(2), Pub. L. No. 117-328 (2023). History shows that the final bill will likely include the rescission in the House-passed bill.

If Congress rescinds PRF dollars, then Hartford Hospital will forever lose access to those funds – funds that Hartford Hospital would have already received but-for the Defendants' arbitrary and capricious Phase 3 reconsideration determination.  The Court cannot order the Defendants to obligate funds for which there is no appropriation.  *E.g., Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (recognizing that courts cannot order obligation of funds for which there is no appropriation).  And money damages would not be available against HRSA under the APA. *See* 5 U.S.C. § 702 (authorizing actions "seeking relief other than money damages"); *see, e.g., New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) ("[B]ecause money damages are prohibited in APA actions, they are irreparable."). The loss of access to

unobligated PRF dollars presently held by HHS will compound the ongoing irreparable harm to Hartford Hospital.  Complaint, Exhibit 1, ¶ 31.

Only a TRO restraining HRSA from enforcing the Phase 3 and Phase 4 determinations against Hartford Hospital will stop the irreparable harm to Hartford Hospital.

### III.     The Phase 3 and Phase 4 determinations are arbitrary and capricious

The APA authorizes a reviewing court to set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706(2).  An agency decision "would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Agencies must act "within a zone of reasonableness and, in particular [] reasonably consider[] the relevant issues and reasonably explain[] the decision." *F.C.C. v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Put differently, agencies must "examine[] the relevant data and [] set out a satisfactory explanation including a rational connection between the facts found and the choice made … ." *Karapova v. Snow,* 497 F.3d 262, 268 (2d Cir. 2007).   The court is "confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).  "[T]he court shall review the whole record or those parts of it cited by a party … ."  5 U.S.C. § 706(2). The whole record is not required to resolve claims under the APA.

#### A.  The Defendants' Phase 3 reconsideration determination is arbitrary and capricious because it is based on a scrivener's error

The basis for the Phase 3 reconsideration determination—the scrivener's error in the Part 3 application—is neither reasonable nor reasonably explained.  It is clear on the face of the

administrative record for the Phase 3 reconsideration determination[1] that HRSA acted arbitrarily and capriciously, and that Hartford Hospital is entitled to relief under any standard of review.

The Phase 3 reconsideration determination is outside the zone of reasonableness because it was based solely on the scrivener's error and not on any statutory criteria. In a variety of legal contexts, including under the Federal Rules of Civil Procedure, such "clerical mistake[s]" are routinely corrected and do not prejudice a party's rights. *See, e.g.*, Fed. R. Civ. P. 60(a) ("The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record."); *Singh v. Garland*, 6 F.4th 418, 429-430 (2nd Cir. 2021) (setting aside immigration judge's adverse credibility determination under 5 U.S.C. § 706 where such determination was made based on minor mistake).

The U.S. Court of Appeals for the District of Columbia Circuit applied this principle in *Communications and Control, Inc. v. F.C.C.*, 374 F.3d 1329 (D.C. Cir. 2004) when reviewing an FCC decision to not allow the correction of a typographical error. The FCC had pronounced an applicant's license *void ab initio* because of a single-digit typographical error in its geographic coordinates, and refused to allow the applicant to correct the error. The D.C. Circuit found the FCC's explanation legally inadequate. *Id.* at 1335-36. The FCC had not given explicit notice that an applicant would bear the full cost of any mistake, and it "must have known" or, "with minimal effort . . . could have determined" the correct information. *See id.*

The U.S. District Court for the Eastern District of Texas recently followed *Communications and Control* and found that it was arbitrary and capricious for HRSA to refuse to allow a hospital to correct a single-digit typographical error in its application for PRF dollars. *Tyler*

---

[1] The HRSA guidance cited by Hartford Hospital is part of the administrative record for the Phase 3 reconsideration determination. So are Exhibit 1, Tabs 1, 3, 4, 5, and 6 to the Complaint; and Exhibit 2 to the Complaint.

*Reg'l Hosp., LLC v. HHS*, No. 6:23-cv-00134, 2023 WL 3506471 (E.D. Tex. May 17, 2023).

HRSA had rejected the hospital's application for Phase 4 ARP rural funding after the hospital

inadvertently entered its tax identification number (TIN) as ending in "5395" rather than "8395."

*Id*. at *4.  HRSA denied the hospital's request to correct the application, and made clear that it

would not reconsider its position and would adhere to a policy of not allowing corrections.  *Id*. at

*5-6.  The district court found that HRSA acted arbitrarily and capriciously because the HRSA did

not provide fair notice that it would hold TIN errors strictly against the applicant, and could have

referred to its own internal records to correct the TIN error with minimal effort.  *Id*. at *7-8.  Plus,

HRSA recognized an interest in correcting errors by holding PRF dollars in reserve, and "nothing

in the Act addresses or prohibits amendments to fix clerical errors." *Id*.

This case is on all fours with *Tyler Regional Hospital* and *Communications and Control*.

HRSA has not and cannot dispute that Hartford Hospital met all statutory eligibility criteria for a

Phase 3 distribution of PRF dollars.  Complaint, ¶ 36.  HRSA based its Phase 3 reconsideration

determination solely on the inconsistency arising from the scrivener's error in Field 10 of the Phase

3 application, which stated that revenues for tax year 2018 were $173,274,568 instead of

$1,732,745,685.  *Id*. ¶¶ 45, 49, 62-63, 69.  HRSA did not give Hartford Hospital explicit notice

that HRSA would strictly construe inconsistencies arising from scrivener's errors against

applicants.  *See Id*. ¶ 40.  Rather, HRSA stated only that "[y]ou cannot edit or resubmit the

application form once it is submitted [through the Provider Relief Fund Application and

Attestation Portal].  You should not apply until you have available all of the required information

and documentation necessary to submit a complete and accurate application."  HRSA, Frequently

Asked Questions: Phase 3 Application Process, HRSA Provider Relief, 67,

https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/provider-relief-fund-faq-

complete.pdf (last updated May 5, 2023).   HRSA thus represented that any submitted documentation was part of a complete application.

HRSA knew the uncontroverted correct revenue figure ($1,732,745,685) during the reconsideration process because Hartford Hospital pointed it out.  Complaint, ¶ 48.  HRSA could have easily validated that figure by reviewing the tax return that was part of the application.  *Id*. ¶¶ 40, 48.[2]  No statute prohibited HRSA from resolving the inconsistency in favor of the uncontroverted correct figure.  It was not at all reasonable for HRSA to affirm its Phase 3 payment determination on those facts.

Also, the Phase 3 reconsideration determination was not reasonable because HRSA deviated from its Phase 3 Payment Calculation Methodology.  HRSA flagged "high-dollar applications" for a "manual review of supporting documentation."  HRSA, Provider Relief Fund Phase 3: Payment Calculation Methodology, pp. 4-5, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/phase-3-methodology-overview.pdf. The Phase 3 application was a high-dollar one; under HRSA's calculations based on the scrivener's error, Hartford Hospital had more than $90,000,000 in "overages."  Complaint, ¶ 44.  A flag should have triggered a manual review, in which HRSA should have resolved the inconsistency arising from the scrivener's error in favor of the uncontroverted correct revenue figure.  HRSA could have reached that resolution quickly and easily through a review of Hartford Hospital's tax return.

HRSA doubled down by failing to articulate a rational connection between the facts found and the choice made. Neither the Phase 3 reconsideration determination nor the Phase 3 payment

---

[2] No hunt through the tax return was necessary.  HRSA guidance instructed applicants to report the program service revenue from line 9 of IRS Form 990 in Field 10 of the cover sheet for the Phase 3 application.  Complaint, Exhibit 2; HRSA, Provider Relief, Frequently Asked Questions, PRB General Distribution and ARP Rural FAQ, Phase 3 – Application Process, https://www.hrsa.gov/provider-relief/faq/general-distribution?categories=227&keywords=. Here, the uncontroverted correct revenue figure appeared in line 9 of Hartford Hospital's Form 990 for 2018. Complaint, ¶ 40.

determination drew a rational connection between the denial of $19,117,790.57 in PRF dollars, and the scrivener's error that was clear on the face of the Phase 3 application *and known to HRSA*. Neither one explained why it made sense to harshly construe the known scrivener's error against Hartford Hospital.  Complaint, ¶¶ 44, 48.  The lack of a satisfactory explanation is yet another reason why Hartford Hospital is entitled to relief under any standard of review.

### B.  The Defendants' Phase 4 payment determination is arbitrary and capricious because it too is based on the scrivener's error in Phase 3

The Phase 4 payment determination is arbitrary and capricious for the same basic reasons that the Phase 3 reconsideration is arbitrary and capricious.[3]  For starters, the Phase 4 payment determination does not specify whether the payment made to Hartford Hospital was a base payment, bonus payment, or combined base and bonus payment.  Nor does the Phase 4 payment determination include an explanation for the calculation of the payment actually made to Hartford Hospital.  HRSA provided that information to Hartford Hospital after making the determination. *See* Complaint, ¶¶ 52-54.  Even then, HRSA failed to explain why HRSA based its determination of the Phase 4 base payment on the Phase 3 payment and overages calculation that HRSA had previously made based on the scrivener's error.  Complaint, ¶¶ 54, 64-65, 67.  HRSA knew about the scrivener's error from the Phase 3 reconsideration process, yet drew no rational connection between that legacy error and the denial of a Phase 4 base payment of more than $23 million.

HRSA's underlying calculation of the Phase 3 "overage" of more than $90 million and its deduction of that amount to zero out the potential Phase 4 base payment was arbitrary and capricious as well.  HRSA calculated Phase 3 overages of $90,540,586.53 by starting with the total payments made to Hartford Hospital in Phases 1 and 2 ($98,320,503.74).  HRSA then subtracted

---

[3] The HRSA guidance cited by Hartford Hospital is part of the administrative record for the Phase 4 payment determination.  So are Exhibit 1, Tabs 1 - 7 to the Complaint; and Exhibit 2 and 3 to the Complaint.

the amount that HRSA found Hartford Hospital was eligible to receive in Phase 3 before deductions ($7,779,917.21), *based on the scrivener's error*. The problem, however, *is that there were never Phase 3 overages*. Hartford Hospital was eligible for a potential payment of $117,438,294.31 in Phase 3 based on the uncontroverted correct revenue figure ($1,732,745,685). After deducting the total payments made to Hartford Hospital in Phases 1 and 2 ($98,320,503.74), Hartford should have received a Phase 3 payment of $19,117,790.57, *with no overages*. Complaint, ¶¶ 5, 54, 56, and 67, and Exhibit 1, ¶ 24, Tab 12 at HARTFORD-00028, HARTFORD-000029, HARTFORD-000034 (chart illustrating differences in calculations shared with HRSA). It was not reasonable for HRSA to calculate Phase 3 overages based on the scrivener's error and then apply them as a deduction in Phase 4, *knowing of the underlying scrivener's error in Phase 3.*

It was not reasonable for the HRSA to calculate a potential Phase 4 base payment of $14,311,597.07 either. Complaint, ¶¶ 54, 56, 66. HRSA should have calculated a Phase 4 base payment equal to 20% of quarterly losses ($23,817,060.80) under its methodology. HRSA apparently applied the mean acute care hospital quarterly loss ratio because Hartford Hospital's corporate affiliate CIP had applied for Phase 4 funds in error. But CIP withdrew its Phase 4 application months before the Phase 4 Payment determination for Hartford Hospital. *Id*. ¶ 66. It was arbitrary and capricious for HRSA to apply the mean acute care hospital quarterly loss ratio based on an admittedly erroneous and withdrawn Phase 4 application.

HRSA's deviation from its methodology and continued reliance on the scrivener's error in Phase 4 entitle Hartford Hospital to relief under any standard of review.

### C.  The balance of the hardships tips decidedly in favor of Hartford Hospital

The U.S. Government's interest is the public interest when the U.S. Government is a defendant. *Cuomo*, 475 F.Supp.3d at 160. "There is generally no public interest in the perpetuation

of unlawful agency action" and "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Cuccinelli*, 419 F.Supp.3d at 666.  The Defendants have "no cognizable interest in failing to pay benefits to [Hartford Hospital] when due." *Cuomo*, 475 F.Supp.3d at 160.  Their Phase 3 and 4 determinations are arbitrary and capricious, and are irreparably harming Hartford Hospital.  The granting of emergency relief will stop the irreparable harm to Hartford Hospital, and cause no hardship to the Defendants.  So the balance of the hardships tips decidedly in favor of Hartford Hospital.

**III.   The Court should stop the irreparable harm to Hartford Hospital**

Hartford Hospital is entitled to a temporary restraining order or, alternatively, a preliminary injunction against the Defendants for the reasons detailed above.

The Court should stop the irreparable harm to Hartford Hospital by ordering the Defendants to do four things.  *First*, immediately obligate $42,934,851.37 in PRF dollars for payment to Hartford Hospital under 31 U.S.C. § 1501(a), subject to the reprocessing of Hartford Hospital's Phase 3 and 4 applications.  The immediate obligation of the maximum amount of PRF dollars sought by Hartford Hospital will protect Hartford Hospital against loss of access to PRF dollars as a result of the likely congressional rescission of appropriations of unobligated PRF dollars.  *Second*, reprocess Hartford Hospital's Phase 3 and 4 applications by May 31, 2023, using the correct revenue amount ($1,732,745,685), and without applying the mean acute care hospital quarterly loss ratio to Hartford Hospital's Phase 4 application based on the erroneous Phase 4 application withdrawn by CIP.  *Third*, determine the final PRF dollars payable to Hartford Hospital, and inform Hartford Hospital of the amount payable and the underlying calculation by May 31, 2023.  *Fourth*, pay the final PRF dollars payable to Hartford Hospital by May 31, 2023.  The reprocessing of the applications, determination of the final PRF dollars

payable, and payment of the final PRF dollars by May 31, 2023 will stop the ongoing irreparable harm to Hartford Hospital caused by the deprivation of PRF dollars.

The relief Hartford Hospital seeks is grounded in persuasive authority. In *Jacksonville Port Authority v. Adams*, 556 F.2d 52, 54 (D.C. Cir. 1977), the D.C. Circuit reversed the district court's denial of the Jacksonville Port Authority's application for a TRO compelling the Federal Aviation Administration (FAA) to obligate funds before the deadline for making obligations expired. The Authority had timely applied for funding before the FAA's cut-off date for funding decisions, but was forced to sue to prevent the available funding from reverting to the Treasury prior to the disposition of its administrative claim. *Id*. at 54. The D.C. Circuit held that it was an abuse of discretion to deny the order where the authority "was in danger of losing the money by lapse of the FAA's authority; and preliminary relief would hold open the grant without actual payment, subject to later modification." *Id*.  Whether funds are scheduled to lapse or be rescinded, the effect is the same: the applicant loses access to the funds while seeking to obtain them through proper procedures. *U.S. v. State of Michigan*, 781 F. Supp. 492, 497 (E.D. Mich. 1991) (granting motion to restrain EPA from de-obligating or transferring funds until final determination on pending administrative appeal of adverse funding decision).

Here, the Defendants have declined to cure their arbitrary and capricious actions at every turn.  It would be manifestly unfair for Hartford Hospital to suffer further irreparable harm— including the loss of access to PRF dollars—under the facts presented here.  The emergency relief sought by Hartford Hospital is rooted in sound legal principles and should be granted.

## CONCLUSION

The Court should grant emergency relief because Hartford Hospital has made a clear showing that Defendants' Phase 3 and 4 determinations are arbitrary and capricious.  Hartford

Hospital is entitled to emergency relief under any standard of review.


Dated: May 23, 2023                    Respectfully submitted,

                                        //s// James J. Healy (ct28447)
                                        James J. Healy
                                        Federal Bar No. ct28447
                                        Cowdery, Murphy, Dannehy & Healy, LLC
                                        280 Trumbull Street, 22nd Floor
                                        Hartford, Connecticut 06103
                                        (860) 278-5555
                                        jhealy@cmdhlaw.com

                                        *Pro Hac Vice Forthcoming*
                                        _____
                                        Brian R. Stimson
                                        D.C. Bar No. 1657563
                                        McDermott Will & Emery LLP
                                        500 North Capitol Street NW
                                        Washington, DC 20001
                                        (202) 756-8000
                                        bstimson@mwe.com

                                        *Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2023, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of

Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*//s// James J. Healy (ct28447)*
James Healy
